
**FILED** LK
4/12/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**1:22-CR-00058**

JUDGE BUCKLO
MAGISTRATE JUDGE FINNEGAN

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 22 CR 58 |
| v. | Violations: Title 18, United States Code, Sections 1341, 1343, and 1512(b)(3) |
| DONALD HENKEL, | |
| a/k/a "D.B. Henkel," | **UNDER SEAL** |
| a/k/a "Donavan Kelly," | |
| a/k/a "Bruce Kelly," | **SUPERSEDING INDICTMENT** |
| MARK HENKEL, and | |
| RAYMOND PAPARELLA | |

## COUNT ONE

The SPECIAL MAY 2021 GRAND JURY charges:

1.    At times material to this Superseding Indictment:

    a.    Defendant DONALD HENKEL resided in Cedar, Michigan.

    b.    Defendant MARK HENKEL resided in Ann Arbor, Michigan. Defendants DONALD HENKEL and MARK HENKEL are brothers.

    c.    Defendant RAYMOND PAPARELLA resided in Boca Raton, Florida.

    d.    Co-Schemer A resided in Michigan.

    e.    Co-Schemer B resided in Ohio and was a relative of DONALD HENKEL and MARK HENKEL.

    f.    Co-Schemer C resided in California.

    g.    Co-Schemer D resided in Virginia and was a relative of MARK HENKEL.

h.     Co-Schemer E resided in Michigan and Florida.

i.     Victim 1 was an auction house engaged in the business of selling artwork and other items at auction. Victim 1 was headquartered in the Northern District of Illinois.

j.     Victim 2 and Victim 3 were art galleries engaged in the business of buying, selling, and consigning artwork. Victim 2 and Victim 3 were headquartered in New York, New York.

k.     Victim 4 was an auction house engaged in the business of auctioning sports memorabilia and other collectibles. Victim 4 was headquartered in Dallas, Texas.

l.     Victim 5 was an auction house engaged in the business of auctioning sports memorabilia. Victim 5 was headquartered in Exton, Pennsylvania.

m.     Victim 6 was an art gallery that collected artwork and fine arts, including the works of George Ault. Victim 6 was headquartered in Hudson, New York.

n.     Victim 7 was an art gallery that collected artwork and fine arts, including the works of George Ault. Victim 7 was headquartered in New York, New York.

o.     Victim 10 was an auction house engaged in the business of selling artwork and other items at auction. Victim 10 was headquartered in New York, New York.

p.     Victim 11 was an auction house engaged in the business of selling artwork and other items at auction. Victim 11 was headquartered in London, United Kingdom.

q.     Victim 12 was a collector, seller, and authenticator of Walt Disney memorabilia located in Laguna Niguel, California.

r.     Victim 15 was the owner of a gallery in Grand Rapids, Michigan.

s.     Defendant DONALD HENKEL maintained a bank account at SunTrust Bank ending in 0683 (the "0683 account").

t.     Defendant DONALD HENKEL also maintained two bank accounts at Chemical Bank ending in 1618 (the "1618 account") and 9410 (the "9410 account").

u.     Defendant MARK HENKEL also maintained a joint bank account with his spouse at Bank of America ending in 6721 (the "6721 account").

2.     Beginning in or around July 2005, and continuing until in or around July 2020, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

DONALD HENKEL,
also known as "D.B. Henkel,"
also known as "Donavan Kelly,"
also known as "Bruce Kelly,"
MARK HENKEL, and
RAYMOND PAPARELLA,

defendants herein, together with other co-schemers, including Co-Schemer A, Co-Schemer B, Co-Schemer C, and Co-Schemer D, knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money from victims, including

3

art galleries, auction houses, and individual buyers, by means of materially false and fraudulent pretenses and representations, and by concealment of material facts, as further described below.

3.  It was part of the scheme that defendant DONALD HENKEL created false works of art and memorabilia and then caused these items to be sold, and attempted to be sold, to potential buyers or victims by presenting the items as genuine. At times, defendant DONALD HENKEL sold artwork and memorabilia directly to buyers or victims and provided a false provenance, or history, of the item as a means to falsely portray the item as genuine. At other times, defendant MARK HENKEL recruited co-schemers and other individuals to pose as the sellers, often referred to as straw sellers, to conceal that DONALD HENKEL and MARK HENKEL were involved with the item and to present a false provenance, or history, of the item as means to falsely portray the item as genuine to potential buyers and victims. Defendant RAYMOND PAPARELLA served as a straw seller of artwork and memorabilia for defendant DONALD HENKEL to conceal DONALD HENKEL's involvement with the items and to provide a false provenance of the items to pass the items off as genuine to potential buyers and victims.

4.  It was further part of the scheme that defendant DONALD HENKEL forged and altered, including applying false signatures, to paintings and collectible memorabilia, including sports, Hollywood, and music memorabilia, to deceive potential buyers and victims, including gallery, auction house, and individual buyers, into believing the paintings were genuine paintings by prominent American artists

4

and the memorabilia genuinely came from or were associated with a prominent person or group.

5.    It was further part of the scheme that defendant DONALD HENKEL purchased various items, such as paintings, baseballs, baseball bats, celebrity photographs and books, record albums, programs, and vintage pens, for use in the scheme. Defendant DONALD HENKEL then used the vintage pens and other materials to alter certain items he purchased to make these items appear more valuable, such as by fraudulently adding an autograph to an item or altering a painting to make it falsely appear to be painted by a prominent artist.

6.    It was further part of the scheme that defendant DONALD HENKEL sold, and attempted to sell, paintings to various victims, providing, or causing to be provided, false accounts of their history, origin, or provenance, in order to deceive buyers into believing the paintings were genuine and more valuable.

7.    It was further part of the scheme that defendants DONALD HENKEL and MARK· HENKEL recruited individuals, including defendant RAYMOND PAPARELLA, Co-Schemer A, Co-Schemer B, Co-Schemer C, and Co-Schemer D, to serve as straw sellers falsely posing as the owners of paintings and memorabilia items, to deceive potential and actual buyers and to conceal the role of defendants DONALD HENKEL and MARK HENKEL with the item or in the potential and actual transactions.

8.    In was further part of the scheme that defendants DONALD HENKEL and MARK HENKEL discussed and agreed on false accounts of the history, origin, or

5

provenance, of the paintings and memorabilia, with recruited straw-sellers, including defendant RAYMOND PAPARELLA, Co-Schemer A, Co-Schemer B, Co-Schemer C, and Co-Schemer D, in order to deceive buyers into believing the paintings and memorabilia were genuine and increase the paintings' and memorabilia's value for sale.

9. It was further part of the scheme that the straw sellers recruited by defendants DONALD HENKEL and MARK HENKEL to sell the paintings and memorabilia, including defendant RAYMOND PAPARELLA, Co-Schemer A, Co-Schemer B, Co-Schemer C, and Co-Schemer D, provided false accounts of the history, origin, or provenance of the paintings and memorabilia to potential and actual buyers of the paintings and memorabilia.

10. It was further part of the scheme that defendants DONALD HENKEL and MARK HENKEL agreed to provide straw sellers, including defendant RAYMOND PAPARELLA, Co-Schemer A, Co-Schemer B, Co-Schemer C, and Co-Schemer D, with a portion of the proceeds of the fraudulent sale of paintings and memorabilia in exchange for these individuals serving as straw sellers.

11. It was further part of the scheme that defendants DONALD HENKEL and MARK HENKEL discussed and agreed upon with straw sellers how the proceeds from the fraudulent sale of paintings and memorabilia would be transferred to the benefit of defendants DONALD HENKEL and MARK HENKEL.

12. It was further part of the scheme that straw sellers, including defendant RAYMOND PAPARELLA, Co-Schemer A, Co-Schemer B, Co-Schemer C, and Co-

6

Schemer D, retained a portion of the proceeds from the fraudulent sale of paintings and memorabilia and transferred the remaining proceeds to the benefit of defendants DONALD HENKEL and MARK HENKEL.

### Sale of purported Honus Wagner-signed and Christy Mathewson-signed baseballs

13. It was further part of the scheme that in or around July 2005, defendant MARK HENKEL put Co-Schemer A in touch with defendant DONALD HENKEL, a/k/a "Don Kelly," for the purpose of selling at auction multiple baseballs, including a purported Honus-Wagner signed baseball and a purported Christy-Mathewson-signed baseball.

14. It was further part of the scheme that defendants DONALD HENKEL and MARK HENKEL recruited Co-Schemer A to sell the items in order to conceal that they were involved with the item and the sale of the item.

15. It was further part of the scheme that defendant DONALD HENKEL provided false information to Co-Schemer A to provide to Victim 5 regarding the baseballs' provenance and instructed Co-Schemer A not to mention DONALD HENKEL's, a/k/a "Don Kelly's" name.

16. It was further part of the scheme that Victim 5 agreed to consign the baseballs, which sold at auction for approximately $121,000, and Victim 5 sent to Co-Schemer A a check for the net proceeds of the sale after commission.

17. It was further part of the scheme that at MARK HENKEL's instruction, Co-Schemer A transferred the majority of the sale proceeds to MARK HENKEL.

7

### *Sale of purported Cy Young baseball bat*

18.    It was further part of the scheme that in or around July 2010, defendant MARK HENKEL contacted Co-Schemer C regarding selling a purported Cy Young baseball bat at auction.

19.    It was further part of the scheme that defendant DONALD HENKEL sent the baseball bat, purportedly used by Cy Young, to Co-Schemer C, accompanied by a letter instructing Co-Schemer C to contact Victim 5 and provide a false history or provenance for the bat.

20.    It was further part of the scheme that Co-Schemer C was recruited and used by defendants DONALD HENKEL and MARK HENKEL to conceal their involvement with the item and in the transaction from Victim 5.

21.    It was further part of the scheme that, at defendants DONALD HENKEL's and MARK HENKEL's instruction, Co-Schemer C concealed from Victim 5 the fact that the bat came from defendants DONALD HENKEL and MARK HENKEL and instead claimed that the bat came from a family member of Co-Schemer C.

22.    It was further part of the scheme that the bat eventually sold at auction for approximately $120,000, and Victim 5 sent to Co-Schemer C a check for approximately $102,000, representing the net proceeds of the sale after commission.

23.    It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer C retained some of the proceeds and then sent to defendant DONALD HENKEL three checks totaling approximately $81,600 from

8

the proceeds of the sale of the item, which were addressed to the payees: "D.B. Henkel," "Donovan Kelly," and Co-Schemer E.

### Sales and attempted sales of other memorabilia by Co-Schemer C on DONALD HENKEL's and MARK HENKEL's behalf

24.    It was further part of the scheme that between approximately 2012 and approximately 2018, Co-Schemer C sold and attempted to sell several other items to various victims, including Victim 5 and Victim 12, using false history or provenance, on behalf of defendants DONALD HENKEL and MARK HENKEL, including a baseball purportedly signed by Thurman Munson, a table purportedly signed and drawn on by Walt Disney, and a photograph purportedly signed by Eddie Gaedel.

25.    It was further part of the scheme that, in connection with certain transactions and attempted transactions, and at defendant DONALD HENKEL's instruction, Co-Schemer C provided false provenance for the items being sold to the victims and deliberately concealed the involvement of defendants DONALD HENKEL and MARK HENKEL in the transactions.

26.    It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer C retained certain proceeds for participating in the sale of items and sent the remaining proceeds to the benefit of defendant DONALD HENKEL.

### Attempted sale and sale of purported Babe Ruth bat

27.    It was further part of the scheme that in or about 2015, defendants MARK HENKEL and DONALD HENKEL brought Co-Schemer B to a memorabilia show for the purpose of selling a purported Babe Ruth-signed baseball bat.

9

28.     It was further part of the scheme that defendants DONALD HENKEL and MARK HENKEL instructed Co-Schemer B to provide a false history or provenance related to the baseball bat to conceal DONALD HENKEL's and MARK HENKEL's involvement with item.

29.     It was further part of the scheme that Co-Schemer B agreed to provide the false history or provenance of the item in exchange for a portion of the proceeds from any sale.

30.     It was further part of the scheme that defendants DONALD HENKEL and MARK HENKEL instructed Co-Schemer B to consign the bat for sale at auction through Victim 5, using the false history or provenance of the item.

31.     It was further part of the scheme that, at defendants DONALD HENKEL's and MARK HENKEL's instruction, Co-Schemer B provided the false history or provenance to Victim 5 and concealed that DONALD HENKEL and MARK HENDEL were involved with the item.

32.     It was further part of the scheme that Co-Schemer B provided the bat for inspection and testing to Victim 5, and that defendant DONALD HENKEL paid for this inspection and testing through Co-Schemer B to conceal DONALD HENKEL's involvement with the item and sale.

33.     It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer B returned the bat to DONALD HENKEL, after Victim 5 declined to auction the bat following examination and testing determining the bat was not authentic.

34.     It was further part of the scheme that defendant DONALD HENKEL later altered the bat, including by removing the purported Babe Ruth signature.

35.     It was further part of the scheme that, in or around 2018, Co-Schemer C consigned or provided for auction, the same bat, on behalf of defendant DONALD HENKEL, as a purported Babe Ruth game-used and unsigned baseball bat, to Victim 4, for sale at auction.

36.     It was further part of the scheme that, at defendant DONALD HENKEL's instruction, Co-Schemer C provided false information regarding the bat's history or provenance to Victim 4.

37.     It was further part of the scheme that by selling the bat through Co-Schemer C, defendants DONALD HENKEL and MARK HENKEL concealed their involvement in the transaction from Victim 4.

38.     It was further part of the scheme that Co-Schemer C received approximately $52,680 from Victim 4 for the sale of the bat.

39.     It was further part of the scheme that, at defendant DONALD HENKEL's instruction, Co-Schemer C sent approximately $39,278 to DONALD HENKEL, which DONALD HENKEL deposited in the 1618 account controlled by him, and approximately $5,500 to defendant MARK HENKEL, which MARK HENKEL deposited in the 6721 account controlled by MARK HENKEL and his spouse.

40.     It was further part of the scheme that Co-Schemer C retained a portion of the proceeds for his role in the sale of the bat.

11

### *Sale of purported Lou Gehrig baseball bat*

41. It was further part of the scheme that in or around 2015, defendant MARK HENKEL contacted Co-Schemer D regarding selling a purported Lou Gehrig baseball bat on behalf of MARK HENKEL, and Co-Schemer D agreed to sell the bat.

42. It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer D contacted Victim 5 about selling the bat.

43. It was further part of the scheme that by selling the bat through Co-Schemer D, defendants DONALD HENKEL and MARK HENKEL concealed their involvement in the transaction from Victim 5.

44. It was further part of the scheme that, at defendant DONALD HENKEL's instruction, Co-Schemer D concealed from Victim 5 the fact that the bat came from DONALD HENKEL and provided false information to Victim 5 regarding the history or provenance of the bat.

45. It was further part of the scheme that the bat sold for approximately $138,000, and Co-Schemer D received approximately $101,015 in net proceeds from the sale.

46. It was further part of the scheme that, at defendants DONALD HENKEL's and MARK HENKEL's instruction, Co-Schemer D transferred approximately $60,000 of the proceeds to DONALD HENKEL, and approximately $30,570 of the proceeds to MARK HENKEL, family members of MARK HENKEL, and an entity identified by MARK HENKEL.

12

47.     It was further part of the scheme that Co-Schemer D retained a portion of the proceeds for his role in the sale of the bat.

### Sale of "Smith Silo Exton," purportedly by Ralston Crawford

48.     It was further part of the scheme that in or around March 2016, defendant DONALD HENKEL contacted a representative of Victim 1 by email regarding the sale of a fraudulent Ralston Crawford painting.

49.     It was further part of the scheme that defendant DONALD HENKEL falsely represented to Victim 1 that the painting was painted by Ralston Crawford, when DONALD HENKEL knew that he himself had made the painting falsely appear like one of Crawford's works, including by adding a signature made to appear to be Crawford's signature.

50.     It was further part of the scheme that defendant DONALD HENKEL provided false information to Victim 1 regarding the history or provenance of the painting.

51.     It was further part of the scheme that the painting sold for approximately $395,000, and defendant DONALD HENKEL received approximately $299,000 in proceeds from the sale from Victim 1 to the 1618 account controlled by DONALD HENKEL.

### Attempted sale of purported Lou Gehrig-signed baseball

52.     It was further part of the scheme that in or around late 2016, at defendant DONALD HENKEL's instruction, defendant RAYMOND PAPARELLA

13

contacted Victim 5 regarding the potential sale of a baseball purportedly signed by Lou Gehrig.

53. It was further part of the scheme that by attempting to sell the baseball through defendant RAYMOND PAPARELLA, defendants DONALD HENKEL and RAYMOND PAPARELLA concealed DONALD HENKEL's involvement with the item and attempted transaction from Victim 5.

54. It was further part of the scheme that RAYMOND PAPARELLA provided the ball for inspection and testing by Victim 5, and Victim 5 returned the baseball to defendant RAYMOND PAPARELLA after an expert examination of the baseball indicated that the signature on the ball was not authentic.

55. It was further part of the scheme that defendant RAYMOND PAPARELLA coordinated with defendant DONALD HENKEL regarding the return of the baseball.

**Sale of "The Homestead," purportedly by George Ault**

56. It was further part of the scheme that in or around February 2017, defendant DONALD HENKEL worked to sell a fraudulent George Ault painting, titled "The Homestead."

57. It was further part of the scheme that defendant DONALD HENKEL falsely represented to Victim 15, and caused Victim 15 to falsely represent to Victim 2, that "The Homestead" was painted by George Ault, when DONALD HENKEL knew that the painting and the signature were not genuine.

14

58.     It was further part of the scheme that defendant DONALD HENKEL falsely represented to Victim 15, and caused Victim 15 to falsely represent a false history or provenance of the painting to Victim 2.

59.     It was further part of the scheme that defendant DONALD HENKEL caused the painting to be sold to Victim 2 and Victim 15 as genuine and defendant DONALD HENKEL received approximately $110,000 from Victim 2 and $15,000 from Victim 15, deposited to the 1618 account controlled by DONALD HENKEL, as his proceeds of the sale of the painting.

60.     It was further part of the scheme that at defendant DONALD HENKELS's instruction, Victim 2 wired an additional $75,000 of the sale proceeds to pay the mortgage of Co-Schemer E.

### Sale of "Country Lane," purportedly by George Ault

61.     It was further part of the scheme that in or around June 2018, defendant DONALD HENKEL contacted Co-Schemer C about selling a painting purportedly by George Ault and titled "Country Lane," to conceal DONALD HENKEL's involvement with the painting and the sale of the painting.

62.     It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer C later provided false information about the history or provenance of the painting to Victim 6 and Victim 7, including that Co-Schemer C inherited the painting from a relative, when Co-Schemer C had received the painting from DONALD HENKEL.

63.    It was further part of the scheme that Co-Schemer C received approximately $77,500 in payment for the painting from Victims 6 and 7.

64.    It was further part of the scheme that, at defendant DONALD HENKEL's instruction, Co-Schemer C wired approximately $65,875 of the proceeds to the 1618 account controlled by DONALD HENKEL.

65.    It was further part of the scheme that Co-Schemer C retained a portion of the proceeds from the sale as payment for his role in the sale.

### *Sale of "Hilltop Farm," purportedly by George Ault*

66.    It was further part of the scheme that in or around March 2018, defendant DONALD HENKEL instructed Co-Schemer E to help sell a fraudulent painting purportedly by George Ault and titled "Hilltop Farm," to conceal DONALD HENKEL's involvement with the painting and the sale.

67.    It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer E contacted Victim 1 about the painting.

68.    It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer E provided false information about the history or provenance of the painting to Victim 1, including that Co-Schemer E had received the painting from a family member who lived in Buffalo, New York, when the painting had been given to Co-Schemer E by DONALD HENKEL in Michigan.

69.    It was further part of the scheme that the painting sold at auction for approximately $47,500, and Co-Schemer E received approximately $33,950 for the sale of the painting from Victim 1.

16

*Attempted Sales of "I.R.T. Powerhouse," purportedly by Ralston Crawford*

70.    It was further part of the scheme that from in or around August 2017 to in or around March 2018, defendants DONALD HENKEL and RAYMOND PAPARELLA communicated regarding the sale of a painting purportedly by Ralston Crawford and titled "I.R.T. Powerhouse."

71.    It was further part of the scheme that defendant RAYMOND PAPARELLA agreed to sell the painting on behalf of defendant DONALD HENKEL and to conceal DONALD HENKEL's involvement with the item or the sale.

72.    It was further part of the scheme that defendant RAYMOND PAPARELLA provided false information regarding the history or provenance of the painting to Victim 10, including that PAPARELLA received the painting after handling estate litigation of a man associated with an architect from New York, when PAPARELLA received the painting from DONALD HENKEL, who resided in Michigan.

73.    It was further part of the scheme that defendant RAYMOND PAPARELLA provided the painting to Victim 10 to allow Victim 10 to submit the painting for inspection and analysis.

74.    It was further part of the scheme that after Victim 10 questioned the authenticity of the painting and declined to sell or consign it, defendant RAYMOND PAPARELLA arranged for the return of the painting from Victim 10 to RAYMOND PAPARELLA.

17

75. It was further part of the scheme that, after defendant RAYMOND PAPARELLA received the painting from Victim 10, PAPARELLA agreed to contact Victim 11 to sell the same painting to conceal defendant DONALD HENKEL's involvement with the painting and the sale.

76. It was further part of the scheme that, defendant RAYMOND PAPARELLA provided false information about the history or provenance of the painting to Victim 11, including that PAPARELLA had received the painting from a client who had obtained it from the family member of an architect's wife, when PAPARELLA received the painting from DONALD HENKEL.

### Sale of "Stacks Up 1st Ave.," purportedly by George Ault

77. It was further part of the scheme that in or around October 2018, defendant DONALD HENKEL worked to sell a fraudulent painting purportedly by George Ault and titled "Stacks Up 1st Ave.," when DONALD HENKEL knew that it was not genuine.

78. It was further part of the scheme that defendant DONALD HENKEL contacted Co-Schemer C to sell the painting to conceal DONALD HENKEL's involvement with the painting and sale.

79. It was further part of the scheme that Co-Schemer C agreed to sell the painting on behalf of defendant DONALD HENKEL and, at DONALD HENKEL's instruction, Co-Schemer C contacted Victim 1 about the painting.

80. It was further part of the scheme that, Co-Schemer C provided false information about the history or provenance of the painting to Victim 1, including

18

that Co-Schemer C inherited the painting from family who had obtained it from an art critic, when Co-Schemer C received the painting from DONALD HENKEL.

81.     It was further part of the scheme that the painting sold at auction for approximately $372,500, and Co-Schemer C received approximately $270,000 in payment for the painting from Victim 1.

82.     It was further part of the scheme that, at defendant DONALD HENKEL's instruction, Co-Schemer C wired approximately $229,500 of the proceeds to the 1618 account controlled by DONALD HENKEL.

83.     It was further part of the scheme that Co-Schemer C retained a portion of the proceeds for his role in the sale of the painting.

### *Sale of "Coming Home," purportedly by Gertrude Abercrombie*

84.     It was further part of the scheme that in or around April 2019, defendant DONALD HENKEL contacted Victim 1 regarding consigning for sale a painting purportedly by Gertrude Abercrombie and titled "Coming Home."

85.     It was further part of the scheme that defendant DONALD HENKEL falsely represented to Victim 1 that "Coming Home" was painted by Gertrude Abercrombie, when DONALD HENKEL knew that the painting was not genuine.

86.     It was further part of the scheme that defendant DONALD HENKEL falsely represented to Victim 1 that DONALD HENKEL had received the painting from an individual in Cleveland, Ohio, who obtained it from the estate of the original owners.

19

87.    It was further part of the scheme that the painting sold at auction for approximately $93,750, and Victim 1 wired approximately $66,375 to the 0683 account controlled by defendant DONALD HENKEL, for the sale of the painting.

### Sale of "Morning in Brooklyn," purportedly by George Ault

88.    It was further part of the scheme that in or around May 2019, defendant MARK HENKEL contacted Co-Schemer D about selling a painting, and Co-Schemer D agreed to sell the painting purportedly by George Ault and titled "Morning in Brooklyn."

89.    It was further part of the scheme that at defendant DONALD HENKEL's instruction, Co-Schemer D contacted Victim 1 about the sale of the painting to conceal defendants DONALD HENKEL's and MARK HENKEL's involvement with the painting.

90.    It was further part of the scheme that defendant DONALD HENKEL caused Co-Schemer D to falsely represent to Victim 1 that the painting was by George Ault, when DONALD HENKEL knew that the painting was not a genuine Ault painting.

91.    It was further part of the scheme that, at defendant DONALD HENKEL's instruction, Co-Schemer D provided false information related to the history or provenance of the painting to Victim 1, including that Co-Schemer D obtained the painting from a family member, when Co-Schemer D received the painting from DONALD HENKEL.

92.    It was further part of the scheme that the painting sold at auction for approximately $336,500, and Co-Schemer D received approximately $238,950 in payment for the painting from Victim 1.

93.    It was further part of the scheme that, at defendant DONALD HENKEL's instruction, Co-Schemer D sent approximately $200,855 to DONALD HENKEL, which was deposited in the 0683 account controlled by DONALD HENKEL, and approximately $14,200 to MARK HENKEL, which was deposited in the 6721 account controlled by MARK HENKEL and his spouse.

94.    It was further part of the scheme that Co-Schemer D retained a portion of the sale proceeds for his role in the sale of the painting.

### Attempted Sales of "Burghal Barber," purportedly by George Ault

95.    It was further part of the scheme that in or around August and September 2019, defendants DONALD HENKEL and RAYMOND PAPARELLA agreed to work together in the attempted sale to Victim 6, Victim 7, and Victim 3 of a painting purportedly by George Ault and titled "Burghal Barber," which was not a genuine Ault painting.

96.    It was further part of the scheme that defendant DONALD HENKEL altered the painting and added the purported George Ault signature to make the painting appear genuine.

97.    It was further part of the scheme that defendant DONALD HENKEL sent the painting to defendant RAYMOND PAPARELLA to allow PAPARELLA to

21

facilitate the sale by showing the painting to potential buyers and to conceal DONALD HENKEL's involvement with the painting or the sale.

98.     It was further part of the scheme that, at defendant DONALD HENKEL's instruction, defendant RAYMOND PAPARELLA contacted Victim 6 and Victim 7 regarding the potential sale of the painting and concealed DONALD HENKEL's involvement with the painting or the sale.

99.     It was further part of the scheme that defendant RAYMOND PAPARELLA met with a representative of Victim 7 so that Victim 7's representative could examine the painting.

100.     It was further part of the scheme that defendant RAYMOND PAPARELLA provided false information regarding the history or provenance of the painting to a representative of Victim 7.

101.     It was further part of the scheme that defendant RAYMOND PAPARELLA communicated to defendant DONALD HENKEL that Victim 7 declined to purchase the painting.

102.     It was further part of the scheme that, at defendant DONALD HENKEL's instruction, defendant RAYMOND PAPARELLA later contacted Victim 3 regarding the potential sale of the painting and concealed DONALD HENKEL's role with the painting or the sale.

103.     It was further part of the scheme that defendant RAYMOND PAPARELLA provided false information regarding the history or provenance of the painting to a representative of Victim 3, including that PAPARELLA had obtained

the painting from PAPARELLA's client, who had obtained it from a third-party's estate, when PAPARELLA had obtained the painting from DONALD HENKEL.

104. It was further part of the scheme that defendant RAYMOND PAPARELLA communicated to defendant DONALD HENKEL that Victim 3 declined to purchase the items over concerns about the authenticity of the painting.

105. It was further part of the scheme that defendant RAYMOND PAPARELLA arranged for the painting to be returned to defendant DONALD HENKEL after Victim 3 declined to purchase the item because Victim 3 believed the painting to be fabricated.

### Attempted sale of "Flour Mill," purportedly by Ralston Crawford

106. It was further part of the scheme that beginning in or around October 2019 until in or around May 2020, defendants DONALD HENKEL and RAYMOND PAPARELLA agreed to work together in the attempted sale to Victim 1 of a painting purportedly by Ralston Crawford and titled "Flour Mill," which was not genuine.

107. It was further part of the scheme that defendant DONALD HENKEL altered the painting and added the purported Ralston Crawford signature to make the painting appear genuine.

108. It was further part of the scheme that defendant RAYMOND PAPARELLA agreed to conceal defendant DONALD HENKEL's involvement with the painting and the sale from potential buyers.

109. It was further part of the scheme that defendant RAYMOND PAPARELLA provided false information to Victim 1 related to the painting, including

23

that the painting was originally owned by an individual in Philadelphia, Pennsylvania, and passed onto various other individuals over the years before being acquired by RAYMOND PAPARELLA's client from a private estate, when PAPARELLA had received the painting from DONALD HENKEL.

110. It was further part of the scheme that defendant RAYMOND PAPARELLA shipped the painting to Victim 1 for inspection, received the painting from Victim 1 when Victim 1 declined to purchase the painting, and later returned the painting to defendant DONALD HENKEL.

### *Attempted sale of Eddie Gaedel-signed baseball*

111. It was further part of the scheme that beginning in or around June 2020, defendants DONALD HENKEL and RAYMOND PAPARELLA agreed to work together in the attempted sale to Victim 4 of a baseball purportedly signed by Eddie Gaedel, which was not genuine.

112. It was further part of the scheme that defendant RAYMOND PAPARELLA agreed to conceal defendant DONALD HENKEL's involvement with the baseball and the sale.

113. It was further part of the scheme that defendant RAYMOND PAPARELLA and defendant DONALD HENKEL agreed on the division of sale proceeds if the baseball was sold.

114. It was further part of the scheme that defendant DONALD HENKEL arranged for the baseball to be delivered to defendant RAYMOND PAPARELLA to facilitate the sale of the baseball.

24

115.    It was further part of the scheme that, defendant RAYMOND PAPARELLA contacted Victim 4 about the sale of the baseball and provided false information to Victim 4 related to the history or provenance of the baseball, including that the baseball came from PAPARELLA's grandfather, when PAPARELLA had received the baseball from defendant DONALD HENKEL.

116.    It was further part of the scheme that defendants DONALD HENKEL, MARK HENKEL, and RAYMOND PAPARELLA concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence, purpose, and acts done in furtherance of the scheme.

117.    On or about June 13, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

DONALD HENKEL,
also known as "D.B. Henkel,"
also known as "Donavan Kelly,"
also known as "Bruce Kelly,"

defendant herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly caused to be deposited with a commercial interstate carrier, namely Atelier 4, a package to be sent and delivered from Victim 1 in Chicago, Illinois, to another victim in Seattle, Washington, which package contained a painting purportedly by George Ault;

In violation of Title 18, United States Code, Section 1341.

25

## COUNT TWO

The SPECIAL MAY 2021 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 116 of Count One are incorporated here.

2.     On or about January 11, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

DONALD HENKEL,
also known as "D.B. Henkel,"
also known as "Donavan Kelly,"
also known as "Bruce Kelly,"

defendant herein, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, and signals, namely, an interstate wire transmission of approximately $135,000 through the Federal Reserve System from Victim 1's account at CIBC Bank USA, to Co-Schemer C's account at Wells Fargo Bank;

In violation of Title 18, United States Code, Section 1343.

## COUNT THREE

The SPECIAL MAY 2021 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 116 of Count One are incorporated here.

2.     On or about June 26, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

DONALD HENKEL,
also known as "D.B. Henkel,"
also known as "Donavan Kelly,"
also known as "Bruce Kelly,"

defendant herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, and signals, namely, an interstate wire transmission of approximately $66,375 through the Federal Reserve System from Victim 1's account at CIBC Bank USA, to DONALD HENKEL's 0683 account at SunTrust Bank;

In violation of Title 18, United States Code, Section 1343.

27

## COUNT FOUR

The SPECIAL MAY 2021 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 116 of Count One are incorporated here.

2.     On or about March 2, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

DONALD HENKEL,<br>
also known as "D.B. Henkel,"<br>
also known as "Donavan Kelly,"<br>
also known as "Bruce Kelly," and<br>
MARK HENKEL,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and sounds, namely an email from Co-Schemer D's Gmail account received by Victim 1's email account in Chicago, Illinois and processed through Gmail servers located outside Illinois, related to a painting purportedly by George Ault;

In violation of Title 18, United States Code, Section 1343.

28

## COUNT FIVE

The SPECIAL MAY 2021 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 116 of Count One are incorporated here.

2.    On or about March 6, 2019, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

> DONALD HENKEL,
> also known as "D.B. Henkel,"
> also known as "Donavan Kelly,"
> also known as "Bruce Kelly," and
> MARK HENKEL,

defendants herein, for the purpose of executing the scheme, and attempting to do so, knowingly caused to be delivered by a commercial interstate carrier, namely FedEx, according to the direction thereon a package addressed to Victim 1 in Chicago, Illinois, containing a painting purportedly by George Ault;

In violation of Title 18, United States Code, Section 1341.

29

## COUNT SIX

The SPECIAL MAY 2021 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 116 of Count One are incorporated here.

2.     On or about April 30, 2020, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

> DONALD HENKEL,
> also known as "D.B. Henkel,"
> also known as "Donavan Kelly,"
> also known as "Bruce Kelly," and
> RAYMOND PAPARELLA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and sounds, namely telephone calls involving RAYMOND PAPARELLA from outside Illinois and a representative of Victim 1, in Chicago, Illinois;

In violation of Title 18, United States Code, Section 1343.

30

## COUNT SEVEN

The SPECIAL MAY 2021 GRAND JURY further charges:

1.    The allegations in paragraphs 1 through 116 of Count One are incorporated here.

2.    On or about May 29, 2020, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

DONALD HENKEL,
also known as "D.B. Henkel,"
also known as "Donavan Kelly,"
also known as "Bruce Kelly," and
RAYMOND PAPARELLA,

defendants herein, for the purpose of executing the scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, and sounds, namely an email from a Gmail account used by RAYMOND PAPARELLA received by Victim 1's email account in Chicago, Illinois and processed through Gmail servers located outside Illinois;

In violation of Title 18, United States Code, Section 1343.

31

## COUNT EIGHT

The SPECIAL MAY 2021 GRAND JURY further charges:

On or about July 9, 2020, at, Michigan, in a telephone call with Co-Schemer D, in relation to an investigation being conducted in the Northern District of Illinois, Eastern Division, and elsewhere,

MARK HENKEL,

defendant herein, knowingly attempted to corruptly persuade another person, namely Co-Schemer D, by instructing Co-Schemer D to make a false statement to a law enforcement officer of the United States, with the intent to hinder or prevent the communication of information relating to the commission or possible commission of a federal offense, namely, wire fraud and mail fraud;

In violation of Title 18, United States Code, Section 1512(b)(3).

32

## FORFEITURE ALLEGATION

The SPECIAL MAY 2021 GRAND JURY further alleges:

1.       Upon conviction of an offense in violation of Title 18, United States Code, Sections 1341 or 1343, as set forth in this Indictment, defendants shall forfeit to the United States of America any property which constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.       The property to be forfeited includes, but is not limited to the following specific property:

     i.          approximately $164,881.11 seized on or about July 7, 2020, from the 0683 account held in DONALD HENKEL's name;

    ii.          approximately $349,335.18 held in escrow by the U.S. Marshals Service, from the sale of the real property commonly known as 9169 E. Hoxie Road, Cedar, Michigan; and

   iii.          the real property commonly known as 795 Cordova Avenue, Ormond Beach, Florida, legally described as follows:

LOTS 11, 12, AND 13, BLOCK 23, SECTION "A" RIO VISTA, ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN MAP BOOK 6, PAGE 25, OF THE PUBLIC RECORDS OF VOLUSIA COUNTY, FLORIDA.

If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21,

33

United States Code Section 853(p). as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____
FOREPERSON


_____
signed by Matthew Madden on behalf of the
UNITED STATES ATTORNEY

34